UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:17-CR-00234 RLW |
| | ) |
| BASEM HAMDAN, | ) |
| | ) |
| Defendant. | ) |

## GUILTY-PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

### 1. PARTIES:

The parties are the defendant BASEM HAMDAN, represented by defense counsel, Andrew Sottile, and the United States of America, represented by the United States Attorney's Office for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney Office for the Eastern District of Missouri (hereinafter USAO). The Court is neither a party to nor bound by this agreement.

### 2. GUILTY PLEA:

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for defendant's voluntary plea of guilty to the offense of conspiracy to distribute and to possess with intent to distribute controlled substances and analogue controlled substances under count II, no further federal prosecution will be brought in this District relative to the defendant's involvement in the conspiracy to distribute and to possess with intent to distribute controlled substances and

analogue controlled substances intended for human consumption between January 1, 2017 and May 23, 2017 of which the USAO is aware at this time.

The parties also agree that the U. S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. However, the parties further agree that either party may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a).

**3. ELEMENTS:**

**a. Count II:**

As to Count II, the defendant admits to knowingly violating Title 21, United States Code, Section 841(a)(1) and 846, and admits there is a factual basis for the plea, and further fully understands that the elements of the crime are the following:

1. Sometime between 2014 and May 2017, the defendant and other persons reached an agreement or came to an understanding to knowingly distribute and to knowingly possess with intent to distribute controlled substances and analogue controlled substances intended for human consumption;

2. The defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and

3. At the time the defendant joined in the agreement or understanding, he knew of the purpose of the agreement or understanding.

## 4. FACTS:

The parties agree that the facts in this case are as follows and that the USAO would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

### a. Background.

Prior to 2015, co-defendants and brothers, Hisham Mutan, Mohammed Almuttan, Rami Almuttan, and Saddam Mutan, purchased and began operating numerous gas stations and convenience stores through St. Louis City and St. Louis County in the Eastern District of Missouri. In July of 2015, the St. Louis Metropolitan Police Department (SLMPD) conducted a search warrant of one of these businesses, Kenyes Market at 5477 North Kingshighway in the City of St. Louis (Kenyes Market). Investigators discovered and seized a package containing approximately 1 kilogram of a powdered synthetic cannabinoid known as ALPHA-PVP.[1] Investigators also recovered dozens of packets of smokable synthetic cannabinoids ready for individual sale to users. The multiple gram packets were labeled with names such as "WTF", "Flamingo", "Caution", "Scooby Snax", "Crazy Monkey", and "Mad Hatter." The packets were intended for human consumption and sold to give the user a "high" when smoked. Laboratory tests of smokable material in the packets revealed the presence of ALPHA-PVP, XLR-11[2], AB-CHIMINACA[3], and other chemicals. Investigators from the Drug Enforcement Administration (DEA) and Homeland Security Investigations (HSI) became involved in the investigation into the Mutan/Almuttan brothers and their businesses.

---

[1] ALPHA-PVP was scheduled as a schedule I controlled substance in the Controlled Substance Act on March 7, 2014 prior to being recovered in Kenyes Market.
[2] XLR-11 was scheduled as a schedule I controlled substance in the Controlled Substance Act on May 16, 2013 prior to being recovered in Kenyes Market.
[3] AB-CHIMINACA was scheduled as a schedule I controlled substance in the Controlled Substance Act on January 30, 2015 prior to being recovered in Kenyes Market.

Throughout late 2015 and 2016, investigators conducted numerous controlled purchases of packets of synthetic drugs from the Mutan/Almuttan brothers' stores including Kenyes Market, Hazelwood Discount Cigarettes at 6950 North Hanley in Hazelwood, MO (Hazelwood), Northway Market at 5590 North Florissant Blvd. in St. Louis, MO (Northway Market), and the Phillips 66 gas station at 2800 North Florissant Blvd. in St. Louis, MO (Phillips 66). On June 30, 2016, the DEA and SLMPD executed a search warrant on Northway Market. Approximately 150 multi-gram packets of smokable synthetic drugs were recovered. During this time, investigators learned that throughout 2015 and early 2016, the Mutan/Almuttan brothers were ordering and receiving their supply of pre-packaged, synthetic drug packets from sources of supply in Chicago, New Jersey, and elsewhere.

In addition to receiving packaged synthetic drugs from suppliers around the United States, in middle to late 2016, the Mutan/Almuttan brothers and co-defendant Saad Al Mallak (Al Mallak) began to manufacture kilogram quantities of their own smokable synthetic drugs at the Mutan/Almuttan brothers' rural property at 7366 Browns Ford Rd. in Dittmer, MO (Dittmer Farm). On November 18, 2016, HSI investigators intercepted a parcel inbound from China and addressed to Al Mallak at the Dittmer Farm containing approximately 1 kilogram of synthetic drug powder that was determined to be a chemical known as FUB-AMB.[4] Al Mallak and others would receive the raw chemical powder from China. At the Dittmer Farm, Al Mallak or others would liquefy the chemical in a solvent such as acetone or Everclear alcohol. That solution was then sprayed on inert but smokable vegetable substances such as Damiana or Marshmallow leaf. Once

---

[4] According to DEA expert chemists and pharmacologists, FUB-AMB is an analogue of the schedule I controlled substance AB-FUBINACA, and when intended for human consumption meets the definition of a schedule I controlled substance under Title 21, United State Code, Section 813. AB-FUBINACA was scheduled as a schedule I controlled substance in the Controlled Substance Act on February 10, 2014.

the product dried, it would be packaged in bulk for delivery by Al Mallak or others to other members of the conspiracy for individual packaging and sale.

   b.   **Intercepted Telephone Communications of the Defendant.**

From November of 2016 to May of 2017, investigators applied for and received numerous Title III intercept authorization from the United States District Court in the Eastern District of Missouri. Investigators monitored the cellular telephones of Mohammed Almuttan, Rami Almuttan, Saddam Mutan, and Hisham Mutan. Throughout the interception periods, investigators intercepted numerous calls from the Mutan/Almuttan brothers to numerous co-conspirators in the St. Louis area, Chicago, IL and New Jersey. In April of 2017, investigators intercepted a series of calls between Rami Almuttan and the defendant discussing the transportation of synthetic drugs for delivery and subsequent sale to several of the Mutan/Almuttan stores. The defendant's role was to transport individual packets and/or condiment cup packed synthetic drugs ("cups") to the stores for sale. At Rami Almuttan's or another of the brother's request, the defendant, would deliver the smokable synthetic drugs to the stores, including, but not limited to Kenyes Market. During this time, the defendant was aware of the illegal nature of the smokable synthetic drugs, knew they were intended for human consumption by smoking, and knew they gave the user a "high" when inhaled, ingested or injected.

   c.   **Deliveries of Synthetic Cannabinoids to Kenyes Market in 2017.**

Throughout early 2017, investigators also maintained static video surveillance outside of Kenyes Market that captured activity on the Kenyes Market parking lot and at the entrance to the store. During the periods of the Title III interceptions, Rami Almuttan or another of the Almuttan brothers used their cell phones to request that the defendant, and others, transport parcels filled with pre-packaged and/or condiment-cupped synthetic drugs to Kenyes Market and other stores

for sale. On several occasions after investigators intercepted these requests, the DEA monitored "pole" camera monitoring activity on the Kenyes Market parking lot, captured the defendant arriving at Kenyes Market and delivering the requested parcels of synthetic drugs to the store for sale.

On April 22, 2017, investigators intercepted calls from Rami Almuttan to the defendant. In that call, Rami Almuttan requested that the defendant bring a parcel of synthetic drugs to Kenyes Market. After Rami Almuttan's request, investigators observed the defendant exit a residence, load a cardboard box containing synthetic drugs in the trunk, and drive to Kenyes Market. Upon arrival, the defendant retrieved a cardboard box of synthetic drugs from rear, right passenger area of the vehicle he was driving. This box of synthetic drugs contained approximately 1 pound (450 grams) of synthetic cannabinoids intended for human consumption. The defendant then entered the store and made the delivery.

On April 29, 2017, a phone conversation between Rami Almuttan and the defendant was monitored during which Rami Almuttan directed the defendant to deliver a "box" or load of synthetic drugs to Kenyes Market. DEA "pole" camera footage at Kenyes Market then showed the defendant arriving onto the lot of Kenyes Market with the box and delivering approximately 1 pound (450 grams) of the synthetic drugs to Kenyes Market to be sold. The defendant knew these synthetic drugs were illegal, knew they were intended for human consumption, and knew the made the user "high" when smoked.

On May 5, 2017, Rami Almuttan again requested a delivery of "the stuff," i.e. synthetic cannabinoids. Investigators observed the defendant drive to Kenyes Market, remove a large black trash bag containing synthetic drugs from his vehicle, and enter the store to deliver those drugs.

6

This bag contained approximately 3 pounds (1,350) grams of synthetic drugs intended for human consumption.

In each of these instances on April 22, April 29, and May 5, 2017, the defendant knew the synthetic drugs he delivered were illegal, knew they were intended for human consumption, and knew they made the user "high" when smoked.

### e. Amount of Synthetic Cannabinoid Defendant is Accountable for.

The amount of controlled substances and/or analogue controlled substances, in light of the known evidence from cellular telephone interceptions, "pole" camera footage, and physical surveillance, attributable to defendant is not subject to precise calculation. Therefore, the parties have agreed the defendant is accountable for the approximately 5 pounds (2,250 grams) of synthetic cannabinoids the defendant delivered to Kenyes Market on April 22, April 29, and May 5, 2017. Further, the defendant admits that he was aware that the synthetic cannabinoids were controlled substances and/or analogue controlled substances that were intended for human consumption and would provide the user with a "high" the same or similar to a scheduled I or II controlled substances.

Also, the defendant was a minor participant in the overall conspiracy. The defendant acted as courier for the Almuttan brothers and transported packets and "cups" of synthetic drugs to the various stores at others' direction. The defendant was paid an hourly rate, did not have a specific proprietary interest in the sale of synthetic drugs, and was not privy to the larger parts of the synthetic conspiracy or other parts of the Almuttan brothers' legitimate and illegitimate businesses.

### 5. STATUTORY PENALTIES:

#### a. Count II:

7

The defendant fully understands that the maximum possible penalty provided by law for the crime to which the defendant is pleading guilty is imprisonment of not more than twenty years, a fine of not more than $1,000,000, or both such imprisonment and fine. The Court shall also impose a period of supervised release of at least three years.

### 6. U.S. SENTENCING GUIDELINES: 2021 MANUAL:

The defendant understands that this offense is affected by the United States Sentencing Guidelines (U.S.S.G.) and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following are the U.S.S.G. Total Offense Level provisions that apply:

**a. Chapter 2 Offense Conduct:**

**(1) Base Offense Level:** The parties agree that the quantity of controlled substances and/or analogue controlled substances for which defendant is accountable, including relevant conduct, is 2,250 grams. When converted under the U.S.S.G. drug equivalency tables in Application Note 8(D) of section 2D1.1 at the ratio of 1 gram of synthetic cannabinoids to 167 grams of Converted Drug Weight, the parties agree the defendant is accountable for between 100 kilograms and 400 kilograms of Converted Drug Weight resulting in a level of 24 pursuant to Section 2D1.1(c)(8).

**(2) Chapter 2 Specific Offense Characteristics**: The parties recommend that the following Specific Offense Characteristics may not or may apply:

**(a.) Weapon Possession**: The parties recommend that the two-level addition for possession a firearm pursuant to Section 2D1.1(b)(1) should NOT apply in this instance. With the evidence presently known, the USAO does not believe it would be able to

establish by a preponderance of the evidence at a sentencing hearing the defendant possessed the firearms that were located in the defendant's residence on May 23, 2017.

**(b.) Safety Valve**: The parties have agreed that a -level reduction pursuant to Section 2D1.1(b)(18) would be appropriate if the defendant otherwise meets the criteria set forth in Section 5C1.2. Based upon the information presently known, the parties recommend that the defendant meets the criteria set forth in Section 5C1.2(a)(2), (3), (4), and (5). Whether the defendant meets the criteria set forth in Section 5C1.2(a)(1), relating to the defendant's criminal history, is left to the determination of the Court as stated in paragraph 6(e) herein. **Defendant understands that he must meet all five criteria contained in Section 5C1.2 to receive the two-level reduction under Section 2D1.1(b)(18).**

**b. Chapter 3 Adjustments**: The parties are unaware of any applicable Chapter 3 Adjustments, other than acceptance of responsibility.

**(1) Minor Role Adjustment:** The parties recommend that two levels should be deducted pursuant to U.S.S.G. §3B1.2(b) in the defendant was minor participant.

**(2) Acceptance of Responsibility**: The parties recommend that two levels should be deducted pursuant to Section 3E1.1(a), because the defendant has clearly demonstrated acceptance of responsibility. Further, the USAO, under the facts known at the present, will make a motion at the time of sentencing for an extra one level reduction based on the defendant's notification to the USAO of the defendant's intention to plead guilty. The parties agree that the defendant's eligibility for this deduction is based upon information presently known. If subsequent to the taking of the guilty plea the USAO receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the USAO may decide not to file such motion without violating the plea agreement.

**c. Other Adjustments and Disputed Adjustments:** None.

**d. Estimated Total Offense Level:** The parties estimate the Total Offense Level is 19. If the Court elects to apply the safety valve, the Total Offense Level would be 17.

**e. Criminal History:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**f. Effect of the Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

## 7. WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:

**a. Appeal:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1) Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery and the guilty plea.

**(2) Sentencing Issues:** In the event the Court accepts the plea, accepts the U.S. Sentencing Guidelines Total Offense Level agreed to herein, and, after determining a Sentencing Guidelines range, sentences the defendant within or below that range, then, as part of this

agreement, the defendant hereby waives all rights to appeal all sentencing issues other than Criminal History. Similarly, the USAO hereby waives all rights to appeal all sentencing issues other than Criminal History, provided the Court accepts the plea, the agreed Total Offense Level and sentences the defendant within or above that range.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

## 8. OTHER:

**a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the USAO.

**b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:**

Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

**c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished.

**d. Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $100, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

**e. Possibility of Detention:** The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

**f. Fines, Restitution, and Costs of Incarceration and Supervision:** The Court may impose a fine, costs of incarceration and costs of supervision. The defendant agrees that any fine imposed by the Court will be due and payable immediately.

**g. Forfeiture:** The defendant agrees to forfeit all of the defendant's interest in all items seized by law-enforcement officials during the course of their investigation. The defendant admits that all United States currency, weapons, property, and assets seized by law enforcement officials during their investigation constitute the proceeds of the defendant's illegal activity, were commingled with illegal proceeds, or were used to facilitate the illegal activity. The defendant

agrees to execute any documents and take all steps needed to transfer title or ownership of said items to the USAO and to rebut the claims of nominees and/or alleged third party owners. The defendant agrees that said items may be disposed of by law enforcement officials in any manner.

## 9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:

In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the USAO to prove the elements of the offenses charged against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the USAO's evidence and discussed the USAO's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and

13

satisfactorily explored all areas which the defendant has requested relative to the USAO's case and any defenses.

## 10. VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT:

This document constitutes the entire agreement between the defendant and the USAO, and no other promises or inducements have been made, directly or indirectly, by any agent of the United States government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT:

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any conditions of release that results in revocation, violates any term of this guilty-plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The USAO may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the USAO agrees to dismiss or not to bring.

January 12, 2022
Date

/s/ John R. Mantovani
JOHN R. MANTOVANI, #50867MO
Assistant United States Attorney

3-31-22
Date

BASEM HAMDAN
Defendant

3-30-22
Date

ANDREW SOTTILE
Attorney for Defendant